**126 NORTHPOINT PLAZA LIMITED PARTNERSHIP, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Q–Ratio Texas, Inc., Third Party/Intervenor.**

No. 94–993C.

United States Court of Federal Claims.

Sept. 7, 1995.

Gary K. Bahena, Washington, D.C., for plaintiff.

Jennifer Hong, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director, of counsel.

Wayne G. Travell, Washington, D.C., for Third Party/Intervenor. Tucker, Flyer & Lewis, of counsel.

## OPINION

FUTEY, Judge.

This pre-award protest is before the court on plaintiff and intervenor's motion to enjoin cancellation of the Solicitation for Offers. Plaintiff, 126 Northpoint Plaza Limited Partnership, and intervenor, Q–Ratio Texas, Inc., request the court enjoin cancellation by defendant, the General Services Administration (GSA) on behalf of the United States, of Solicitation For Offer MTX 93415 (SFO).

Based on testimony obtained at the hearing, oral argument, and the pleadings, this court concludes that the contracting officer abused his discretion in cancelling this SFO. Therefore, cancellation is enjoined and plaintiff and intervenor should be given the opportunity to comply with the agency's current modified requirements.

### Factual Background

The SFO was issued on October 18, 1993, soliciting offers for the lease of a single use building in Houston, Texas. The building would serve as a facility for the United States Immigration and Naturalization Service (INS). A total of 21 initial responses were received. Of those buildings, only plaintiff was eventually deemed responsive to INS' needs. Defendant was concerned that it only had one building to consider; and, in July of 1994, GSA discovered that there were other buildings in the Houston area that could meet the requirements of the SFO. GSA conducted a market survey of the buildings and decided to solicit them. In accordance with GSA's regulation entitled, "Late Submissions, Modifications, and Withdrawals of Offers," codified at 48 C.F.R. § 552.270–3, GSA decided to evaluate the new offerors' buildings. Between July and September 1994, defendant conducted negotiations with the new offerors and continued negotiations with plaintiff.

As of September 21, 1994, GSA determined that negotiations were complete with respect to all relevant parties and solicited best and final offers (BAFOs). After evaluating the criteria, GSA forwarded a proposed lease to the intervenor stating, "[t]his proposed lease does not constitute an award." Thereafter, plaintiff filed a complaint in this court setting out its grounds for a pre-award protest. GSA never signed the lease with intervenor, and instead, determined to cancel the SFO. On April 7, 1995, the contracting officer (CO) issued findings and determinations concluding that INS's requirements had changed substantially due to operational needs, and that upon resolicitation, the potential for enhanced competition and better pricing existed. On April 10, 1995, GSA formally cancelled the solicitation.

### Discussion

#### I. Jurisdiction

■ This court and its predecessor, the Court of Claims, have long exercised jurisdiction over suits by disappointed bidders for alleged breach of an implied contract to consider bids fairly and honestly. *Keco Indus., Inc. v. United States,* 192 Ct.Cl. 773, 428 F.2d 1233 (1970); *Coastal Corp. v. United States,* 6 Cl.Ct. 337 (1984). Successful plaintiffs in these actions were once limited to recovery of bid preparation costs. *Morgan Business Assocs., Inc. v. United States,* 223 Ct.Cl. 325, 619 F.2d 892 (1980). In 1982, Congress enhanced this court's remedial powers with respect to such actions by enacting 28 U.S.C. § 1491(a)(3), which provides in pertinent part:

> To afford complete relief on any contract claim brought before the contract is

awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable relief as it deems proper, including but not limited to injunctive relief.

The Court of Appeals for the Federal Circuit has held that the equitable jurisdiction of this court includes the power to direct reinstatement of a solicitation, provided the suit requesting this remedy was filed prior to contract award. *National Forge Co. v. United States,* 779 F.2d 665, 667 (Fed.Cir.1985); see also *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983) (the court's equitable powers under 28 U.S.C. § 1491(a)(3) "can be invoked only by filing a claim with the court before a contract is awarded"). Here, the solicitation had not been awarded as a contract at the time plaintiff filed this action.

## II. *Standard of Review*

█ Plaintiff and intervenor carry a substantial burden of proof concerning the nature of the contracting officials' actions. Review is limited because contracting officials "may properly exercise wide discretion in their evaluation of bids and in their application of procurement regulations." *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), aff'd, 854 F.2d 464 (Fed.Cir. 1988); *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985). Indeed, a contractor is never assured that it will receive an award and the government retains discretion to reject all bids without liability, even after there have been extensive negotiations with a bidder. *American Gen. Leasing, Inc. and Infodyne Systems Corp. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 58 (1978).[1]

█ The parties must show, by clear and convincing evidence, that either: (1) the government officials involved in the procurement process lacked a rational or reasonable basis for their cancellation decision; or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations. *CACI Field Servs., Inc.,* 13 Cl.Ct. at 725; *Aviation Enters., Inc. v. United States,* 8 Cl.Ct. 1, 15 (1985); *Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 394 (1984). With respect to "clear and prejudicial violation of applicable statutes or regulations," *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983), plaintiff must do more than raise an issue concerning a violation of any law or regulation. The violation in question must be one that denied impartial consideration to which the parties were entitled under the implied contractual obligations of the government. *CACI Field Servs.,* 13 Cl.Ct. at 726.

█ Finally, in applying the above legal standards, it is significant "that the procurement in this case was conducted in the context of negotiation rather than by formally advertised bidding." *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980). In negotiated procurements, contracting officials possess "broad discretion in the process of obtaining the contract most beneficial to the government." *CACI Field Servs.,* 13 Cl.Ct. at 726; *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985). "In formally advertised bidding the pertinent statutes and regulations are far more strict about the conduct of the procurement than [they are] in a negotiated one[;] consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion...." *Burroughs Corp.,* 223 Ct.Cl. at 65, 617 F.2d at 598.

## III. *Final Determination*

### A. *Substantial Changes*

█ In defendant's final determination, the CO reasoned that substantial changes in INS' needs warranted cancellation. Moreover, he concluded that cancellation would lead to improved competition and better pric-

---

1. In order to secure reinstatement of the cancelled solicitation, the parties must first demonstrate that they have standing to request such relief. Only those bidders who were "within the zone of active consideration" at the time a solicitation was cancelled have standing to challenge the cancellation. *See Morgan Business Assocs., Inc. v. United States,* 223 Ct.Cl. 325, 332, 619 F.2d 892, 896 (1980); *Vulcan Eng'g Co. v. United States,* 16 Cl.Ct. 84, 88 (1988). On April 10, 1995, the date of cancellation, both parties were within the zone of active consideration and thus have standing to challenge the cancellation.

ing. Defendant presented the court with a time line illustrating what changes occurred from the beginning of the solicitation until cancellation. Mr. Gerard Kelley, the CO, testified. When the SFO was originally issued on October 18, 1993, the requirements included a square footage base of 66,686, seventy-three Government Operated Vehicle (GOV) secured parking places, an additional 500 parking spaces within $\frac{9}{10}$ of a mile radius of the building, and a sallyport which was identified as three parking spaces approximately 900 feet, and fencing. On February 15, 1994, the first amendment to the SFO was issued changing the space requirements to 73,051 square feet. In April 1994 an amendment changed the sallyport requirements to provide protected access to the detention and deportation area. Another pertinent amendment was issued on September 14, 1994, modifying the 500 parking spaces to be ground level rather than deck parking. This was the last of a total of five amendments to the SFO.

In the middle of October 1994, GSA was seriously considering two offerors, plaintiff and intervenor. As a matter of fact, intervenor was issued an initial lease to sign. Around that time, Mr. Kelley received a call from INS voicing concern over the distance from the intervenor's building to the remote parking lot. Officials from GSA and INS met on October 31, 1994, to discuss issues. The meeting dealt with questions about the number of parking spaces, distance of the parking lot to the building, and the sallyport's ability to offer protection and security. After this meeting, Mr. Kelley testified that he sat down with the offerors to determine if their buildings could accommodate the agency's concern. The offerors presented Mr. Kelley with solutions to the agency's needs. The court is convinced that Mr. Kelley did not believe that these problems were so significant as to warrant cancellation.

2. Tr. at 513 (16–23).

3. Tr. at 524 (9–10).

4. When the solicitation was actually issued to bidders, however, the square footage requirement had been raised to approximately 70,000

On November 28, 1994, however, Mr. Kelley requested a new SF–81 from INS. Nevertheless, he testified that at that time he was still considering amending the current solicitation rather than cancelling and resoliciting.[2] As a matter of fact, a draft of that amendment was prepared. In March of 1995, Mr. Kelley informed INS that this solicitation was going beyond his initial time frame. He advised INS to geet back to him by the end of March or he would cancel the solicitation. On April 10, 1995, INS issued a new SF–81 requesting 74,972 square feet of space. Additionally, INS requisitioned 500 parking spaces which needed to be on-site or on adjacent property and increased the number of secured Government Operated Vehicle spaces to 98. The sallyport had to be a single pass (one way) with dimensions of 30 by 60. The solicitation was cancelled that same day.

B. *Duty to consider bids fairly and honestly*

Initially, Mr. Kelley testified that, "the biggest reason [for cancelling the solicitation] was the change in square footage."[3] When the solicitation was advertised, the square footage requirement was 66,686 square feet. The current requirement of 74,972 square feet was approximately 12% over what was originally advertised, and he was concerned that the modification may cause a problem during the review process of the contract.[4] An increase of the square footage requirement in itself, however, does not always warrant cancellation. During the trial, Mr. Kelley opined that, "[w]e don't cancel the solicitation [based on an increase in the square footage requirement]. We would have to readvertise and at least make the public aware of the change. But we wouldn't necessarily have to change—or cancel the solicitation for a change in the square footage."[5] Despite his earlier testimony, Mr. Kelley ultimately concluded that other factors convinced him to cancel this solicitation.

square feet. Therefore, the change in square footage, between the solicitation which was actually issued and the new SF–81, is approximately 5%.

5. Tr. at 527(12–16).

In order to validate the alleged operational changes, defendant presented testimony of the District Director of INS in Houston, Mr. Anthony Wallis. His main concern about the building, which would be used to accommodate INS, was the access for officers escorting criminal aliens. He believed that the building had to incorporate a secure area for processing the aliens. Mr. Wallis explained that with recent changes under the immigration laws, most specifically the Violent Crime and Control Act, Houston would see an increase in the processing of criminal aliens. Mr. Wallis' main concern was that the bus carrying these aliens would be able to go directly to a secure area without accessing the public parking lot.

Mr. Wallis was also anxious about the number of parking spaces that would be available. Currently the office which INS inhabits has a terrible problem with inadequate parking, both for customers and employees. The court finds significant the fact that INS had a history of problems with parking before the original SFO was issued. Both parties presented evidence that INS has experienced continual problems accommodating their parking requirements. Nevertheless, the "change" in parking has nothing to do with the number of spaces but rather the location of the lot. Oddly, remote parking lot was not questioned until mid-October 1994. INS objected that the parking lot was more than $\frac{2}{10}$'s of a mile from intervenor's building. Thereafter, Mr. Kelley requested verification from the offeror and was satisfied that the parking lot, in terms of travel distance, met the solicitation's requirement.[6] This, however, was not satisfactory for INS whose officials had to personally measure the distance with a tape measure from the front door of the building to the remote parking.[7]

Intervenor's expert, Mr. Wyatt, a real estate specialist in the Houston market, was involved with the SFO from the very beginning. He testified to the continued tirade of problems that began only after INS inspected the Q-ratio building. Specifically, Mr. Wyatt stated, "[i]t seemed like every couple of days, they'd bring up another objection to the building that we would jump through hoops to overcome. They talked about the fact that ... 'your remote parking lot is down the street; the bus stop is around the corner ... we do not want our visitors walking down the street to and from the building. That's an unsafe situation.' We told them we would try to get sidewalks installed to and from those areas. And their response was basically, 'you're not going to be able to get that done.' "[8]

Another change involved the sallyport, an enclosed area where criminal detainees could be loaded and unloaded. Ingress and egress from that area also became an issue after INS officials visited intervenor's building. Evidently Mr. Kelley did not take this issue seriously. Various people, including Mr. Kelley himself, testified to his lukewarm reaction to Mr. Wallis and other INS officials' distress over the sallyport. In polite terms, Mr. Kelley believed that their concern was foolish. Further, he candidly stated that the sallyport is a temporary structure, which can easily be constructed and taken down. In Mr. Kelley's own words, "the sallyport is ... nothing more than chain length fence and some barbed wire."[9] It is obvious that Mr. Kelley did not consider the sallyport requirement an operational change warranting cancellation of the solicitation.

The court finds that the cancellation occurred as a result of INS' intent to avoid a contract with a particular building. The CO attempted to work with the agency and amended the solicitation five times to accom-

---

**6.** Tr. at 500 (2–8).

**7.** See Tr. at 296 (3–6). GSA, the agency actually charged with awarding the contract, was not so concerned. When questioned how GSA measures whether something meets the 2/10 of a mile requirement, Mr. Kelley responded:

Basically, when we use the terminology, as we did here, it would be as a crow flies, string in a pin. We say 2/10 of a mile, we do 2/10 of a mile on a map. And as long as the points between the property and whatever the thing is that we're looking for fall within that, it would just be the points. That would be satisfactory to us.

**8.** Tr. at 462 (14–25).

**9.** Tr. at 554 (9–13).

modate certain requirements. INS' trivial objections could have easily been solved with modifications as had been done before. It is clear, however, that an amendment was not issued a sixth time only because INS wanted to avoid contracting with a particular offeror. Most telling is a draft letter from Mr. Don Cundiff, Assistant Regional Administrator for INS, where he expressly directs GSA to kick out intervenor, Q–Ratio's building.[10] That honest, albeit prohibited, request accurately reveals the chain of events which led to cancellation. That same letter became final on November 10, 1994; however, there was nothing specifically mentioning intervenor's property. Rather the letter generally addressed "security items" without mentioning a particular offeror.[11] The court believes that the letter was amended because of Mr. Kelley. Anticipating a legal conflict, he informed the agency that he could not cancel a solicitation in order to avoid contracting with a particular qualified offeror, therefore, the agency had to formulate objective reasons for cancellation. Mr. Travell, counsel for the intervenor, posed the following questions to Mr. Kelley: [12]

> Q: ... you were aware that INS was attempting to knock out the Q–Ratio building, is that correct?
>
> A: ... that's correct.
>
> Q: ... you or Ms. Berman advised INS officials that course of conduct would invite a protest from my client, is that not correct?
>
> A: That's correct.
>
> Q: And that they had to elevate their concerns to operational issues, rather than trying to go after a particular buildings [sic]; is that correct?

A: That is correct.

Thereafter, INS formulated its objective needs with an intent to disqualify a particular bidder. The alleged "operational changes" were merely excuses for an alternative agenda.

Defendant's second reason for cancelling the procurement, an increase in competition, is even less credible. Plaintiff and intervenor's experts successfully convinced the court that the availability of other buildings in the Houston market was minimal. Despite his reasoning that cancellation would enhance competition, Mr. Kelley testified that the vacancy rate in the Houston market had decreased, and there would be fewer buildings available in this area today than there had been in 1993. Mr. Travell questioned Mr. Kelley: [13]

> Q: You testified ... that you believed the vacancy rates have gone down in the Houston market?
>
> A: Decreased, yes.
>
> Q: ... Which would mean that there would be less space available for INS?
>
> A: Yes.

Thus, the potential for competition had also decreased. Moreover, at the time of cancellation, Mr. Kelley had in mind to solicit only two buildings. The court is confused how two buildings would qualify as an increase in competition. Nevertheless, even these two buildings could not conform to the agency's current requirements, and defendant had to be aware of this reality. Of the two buildings considered one has sold and currently operates, by the buyer, as a retail store. That sale occurred in March of 1995, one month before the cancellation.[14]

10. Discovery Documents at 5.

11. Supplemental Administrative Record at 63.

12. Tr. at 581(9–16), 582(1–9).

13. Tr. at 592(1–21).

14. Using this building as an example of a potential offeror in the Houston area is disingenuous. When this building was originally considered, *and rejected,* by GSA, Ms. Linda Perry prepared the pricing memorandum for the site. It states:
    [t]his building is a two story building with no windows. Windows would have to be installed in numerous areas. The parking situation is questionable. Currently only 397 spaces are available ... This building is basically landmarked, and the required additional parking would require the effort to buy parking from other retail establishments that surround this building. The agency was concerned ... about security with this building: access in and out of the building is limited to this location, being prime retail, and a major mall is directly across he street.
    *See Tab 12 Administrative Record.* This building could not, even arguably, accommodate the agency's stated needs.

The second building is in a retail mall separated by a movie theater whose lease continues for another 15 years. Most significant is that the total amount of square feet of the building is 83,026, which includes the movie theater's 15,000 square feet. Thereby, the total amount of available square feet in the building is approximately 68,000 square feet. This square footage could not have satisfied the original solicitation's requirements let alone the "new" requirements. Thus, it is obvious that neither building adequately meets the needs of INS as stated to this court.

Finally, defendant did not convince the court that, under its own guidelines, a build to suit was possible. Mr. Kelley testified that the agency is discouraged from "doing build to suits when there is a[n] adequate supply ... of vacant space in the market of existing buildings." [15] Mr. Kelley cancelled the solicitation, in part, on the prospect of increased competition.[16] Thus, one would assume that an adequate supply of potential buildings existed and a build to suit would be unjustified. The court recognizes, however, that increased competition is an illusion.

Mr. Kelley, however, also testified that, "[b]uild to suits primarily come into play ... if the requirements [for the building] are so different...." [17] In describing the building which would fit INS' needs, Mr. Kelley stated, "[t]he building, itself, as described, is pretty much vanilla.... There's no major special requirements ... there's really nothing, you know, much unique there...." [18] Accordingly, by GSA's own standards, a build to suit would not be appropriate for this solicitation.

In *Heyer Prods. Co. v. United States,* 147 Ct.Cl. 256, 177 F.Supp. 251 (Ct.Cl.1959), the Court of Claims established a governmental duty to conduct fair procurements. The court reasoned that by soliciting for bids, the government impliedly promises to give honest and fair consideration to all bids. *Id.* The legal question before the court is whether the government met its implied contractu-

al obligation to consider fairly and honestly all responsive bids. *Prineville Sawmill Co. v. United States,* 859 F.2d 905 (Fed.Cir.1988). The overwhelming evidence presented to the court indicates that the government did not meet its obligation. It is evident that INS was unhappy with a particular building. In fact, INS openly and fervently campaigned to rid itself of intervenor's building. They were admonished and, fearing a bid protest, GSA directed INS to revise their subjective objections.

The court is surprised how remarkably similar the instant protest is to one recently decided by another judge on this court and affirmed by the Court of Appeals for the Federal Circuit. In *Parcel 49 Ltd. Partnership v. United States,* the trial court found that the contracting officer's primary stated reason for cancellation, a change in space requirements, was merely a pretense for accommodating the agency's (FCC) displeasure with the selection of Parcel 49C. *Parcel 49 Ltd. Partnership v. United States,* Slip op. 92–286 (Fed.Cl. Mar. 14, 1994). Additionally, the court found that contributing factors, raised at trial, for the cancellation were not credible justifications. The Federal Circuit agreed with the trial court's determination that the "FCC intended to take whatever steps were necessary to avoid [contracting with Parcel 49C]." *Parcel 49C Ltd. Partnership v. United States,* 31 F.3d 1147, 1151. In affirming the trial court's decision, the Court of Appeals for the Federal Circuit states: "[a]s our prior decisions have implicitly recognized, the government's duty to treat a bid honestly and fairly runs first of all to the enterprise submitting that bid." *Id.* (citations omitted).

Analogous to *Parcel 49 Ltd. Partnership v. United States,* GSA, in this procurement, had no rational basis for cancellation. "The law of procurement does not tolerate 'actions reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence.'" *Parcel 49 Ltd. Partnership v. United States*

15. Tr. 395(14–18).

16. See Tr. at 541 (3–250).

17. Tr. 395 (1–7).

18. Tr. at 597(16–23)

at 1153 (citations omitted). GSA officials' discretionary power does not include yielding to pressures such as those exerted by INS. Defendant is not vested with unfettered discretion to cancel procurements. It is bound to exercise discretion in a reasonable and fair manner. The evidence indicates that GSA, in an attempt to accommodate INS, cancelled this solicitation without actual justification. It is certain that the cancellation would not enhance the competitive process. Further, the operational changes cited in defendant's report were nothing more than pretenses to avoid contracting with a particular bidder. INS' effort to rid itself of intervenor's building was blatant and defendant was unable to conceal that fact from the court. Defendant's action in this case violated its duty to conduct a fair procurement and was an abuse of discretion. *Parcel 49C Ltd. Partnership v. United States,* 31 F.3d 1147 (Fed.Cir.1994), *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 910–11 (Fed Cir.1988).

### Conclusion

 Plaintiff and intervenor request injunctive relief to remedy GSA's improper action. The court is satisfied that plaintiff and intervenor have demonstrated through clear and convincing evidence that the government's decision to cancel this award lacked a rational or reasonable basis. The balance of equities are in favor of plaintiff and intervenor; moreover, the public interest is served by this type of injunctive relief. Resolicitation would only result in further, unnecessary expenditures of government resources. It would also reward the illegality, "accomplishing nothing more than a stern finger wagging in the direction of [INS] and GSA." *Parcel 49C Ltd. Partnership v. United States,* 31 F.3d 1147, 1154. The government has shown no likelihood of material harm to its interests from an injunction. Imposition of an injunction is consistent with this court's limited role and will also remove the taint of illegality from this procurement without interfering with defendant's discretion to select its own contractors. The injunction does not direct the contract award to a particular bidder, but simply restores the status quo before the illegal cancellation. The government retains the power to proceed with its award process that can accommodate INS' present needs.

In sum, plaintiff and intervenor must still undergo the approval process. The court is also persuaded to grant this relief based on the parties' representations. Specifically, the court questioned plaintiff and intervenor how they intended to work it out between them if the court does enjoin this cancellation. Both parties responded that they would get it done.[19] Presumably, this process will also be instrumental in accommodating INS' needs. The cancellation is hereby enjoined and plaintiff and intervenor shall have the opportunity to meet GSA's current amended requirements.

The Clerk is directed to enter judgment in accordance with this opinion. No costs.

---

**19.** Tr. at 643 (8–25); 644 at (1–25); 645 at (1–9).