### UNITED INTERNATIONAL INVESTIGATIVE SERVICES, INC., Plaintiff,

v.

### The UNITED STATES, Defendant,

and

### MVM, Inc., Intervenor.

### No. 98–80C.

United States Court of Federal Claims.

July 7, 1998.[1]

---

1. This opinion was originally issued and filed under seal on June 19, 1998. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. Only intervenor, MVM, Inc., proposed redactions. The court did not redact all the requested material because, in the court's view, the information was neither confidential nor protected. Redactions are indicated by asterisks within brackets ( [* *] )

Alan M. Grayson, McLean, VA, attorney of record for plaintiff. Grayson & Associates, PC; Michael Lewis, of counsel.

Laureen Kapin, Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Kirk T. Manhardt, Assistant Director; and Gerald Elston, United States Marshals Service, of counsel.

Richard D. Lieberman, Arlington, VA, attorney for Intervenor MVM, Inc., Kinosky, Phillips & Lieberman, PLC, of counsel.

## OPINION

FUTEY, Judge.

This post-award bid protest action is before the court on plaintiff's motion for a permanent injunction and defendant's motion for summary judgment on the administrative record. Plaintiff maintains that, because its proposal was "substantially equal" to the proposal of the contractor ultimately awarded the contract, and plaintiff was the lowest priced offeror, it should have received the subject contract. Plaintiff further asserts that numerous irregularities in the procurement process violated applicable laws and regulations, and were ultimately prejudicial to plaintiff. Defendant avers that its actions during the procurement process were neither arbitrary nor capricious. Defendant thus argues that it is entitled to judgment as a matter of law.

### Factual Background

On March 17, 1997, the United States Marshals Service (defendant) issued Request for

Proposals No. MS–CSC–97–R–0002 (RFP) for court security officers for federal courthouses in the Second Judicial Circuit, encompassing one base year with four one-year options. The RFP sought a contractor that would "provide all necessary manpower, supervision, transportation, equipment, and clothing, not provided by the government, to perform court security services for each [United States Marshals Service] District covered by th[e] contract." [2]

The RFP provides that defendant will award the contract to the "offeror whose proposal, conforming to the solicitation, is determined to be in the best interests of the Government, price and other factors considered. The Government reserves the right to award to other than the lowest cost proposal and to reject any or all proposals." [3] Further, the RFP states that "technical capability and quality are considered more important tha[n] cost or price." [4] In this regard, it notes that offerors could receive a maximum of 60 points for their technical proposals and a maximum 40 points for their price.

In evaluating offerors' technical proposals, the RFP provides that:

A Technical Evaluation Board [(TEB)] has been established within the [United States Marshals Service] to evaluate technical proposals. *Each member* of the board will evaluate each proposal in accordance with the evaluation criteria designated in this solicitation.... A weighted score will then be computed for each proposal by averaging the score given to the proposal *by each board member.* This average (weighted) score constitutes the number of technical points. *Offerors should note[,] however, that the evaluation of the TEB is only advisory and the Contracting Officer retains the ultimate authority to determine the technical evaluation of each proposal.*[5]

The RFP also explains that "[b]etween substantially equal technical proposals, the proposed price will be the determining factor in selection of a proposal for award. Between acceptable proposals with a significant difference in technical weighing (and/or merit), a determination will be made as to whether the difference in technical merit reflected by a proposal from other than the low acceptable offeror warrants payment of a premium in price." [6]

Defendant received a total of eighteen proposals in response to the RFP, including one from plaintiff and one from intervenor, MVM, Inc. (MVM). During the week of June 9, 1997, a six-member TEB convened in South Burlington, Vermont, and evaluated the eighteen submitted proposals. In order to evaluate these proposals, the TEB members were guided by a "Technical Evaluation of Proposals for Negotiated Procurements" (Technical Evaluation). This document states, in pertinent part:

A. Technical evaluation of proposals is conducted by a ... [TEB] of representatives determined by the requiring office.

B. The TEB should have at least three members. There must always be an uneven number of TEB members, to include the TEB Chairperson.

* * * *

D. *Step 1—Preliminary Evaluation Report*

1. *Task 1:* The first task consists of an initial review by each TEB member to classify the proposals as *acceptable. conditionally acceptable,* or *unacceptable ....*

2. *Task 2:* The initial classification of proposals is followed by a second review to comparatively assess each offeror's potential to satisfy the specification or statement of work, by applying the technical evaluation criteria and associated numerical weights stated in the [RFP].

3. Task 1 and Task 2 are conducted independently by each TEB member.

* * * *

6. *Task 3:* Finally, the results of the independent technical evaluations are merged into a summary report subsequent

---

2. Administrative Record (A.R.), Tab 6, at C–3.

3. *Id.,* at M–2.

4. *Id.,* at M–1.

5. *Id.,* at M–3 (emphasis added).

6. *Id.,* at M–5.

to a group discussion attended by all TEB members.... The purpose of the group discussion is to arrive at a consensus concerning the strengths, deficiencies, and weaknesses of a proposal, the score to be applied, and changes in individual opinions concerning a proposal's response to a given [RFP] factor based upon a group review of each committee member's perspective.

\* \* \* \*

8. When a TEB member adjusts his/her individual evaluation, a separate evaluation form is completed indicating a revision. This form shall address those criteria for which the evaluator's opinion has changed, together with the supporting rationale for the change.[7]

The members of the TEB utilized these instructions in evaluating each offeror's proposal. As a result of their evaluations, TEB Chairman Jack Rouille, issued a report on June 19, 1997, summarizing the conclusions derived from the evaluations. Specifically, Mr. Rouille noted that five of the offerors were determined to be "Acceptable as Submitted." Within that group, plaintiff tied for second with a score of 56.67, and MVM ranked [* *] with a score of [* *].[8] In addition, Mr. Rouille observed that the TEB ranked one offeror as "Conditionally Acceptable" and the remaining twelve offerors as "Unacceptable."[9] Further, Mr. Rouille noted that the criteria by which the TEB members evaluated the proposals were not a particularly effective means of determining the offerors' technical score and that the system was in need of revision.

Between July 21, 1997 and July 30, 1997, however, two members of the TEB, Al Viti and Joseph Guccione, "were chosen by the Chairperson to consolidate the scores and assure that the scoring given to the offerors were warranted in merits and supporting

data."[10] Mr. Guccione was responsible for re-evaluating plaintiff's proposal. The submissions to the court are not clear, but it is undisputed that either one, or both, re-evaluated MVM's proposal. As a result of this re-evaluation, Mr. Rouille drafted a second report indicating that: (1) plaintiff's technical score was reduced to 49 points and lowered its ranking to fifth overall; and (2) MVM's score was reduced to [* *] points and its ranking remained at [* *] overall.[11]

Utilizing this information, the Contracting Officer, Jack Kraus, determined that plaintiff, MVM, and five other offerors were within the competitive range, and conducted discussions with these offerors in early September 1997. The remaining eleven offerors were excluded from these discussions. Mr. Kraus felt "[t]here was some concern in keeping [plaintiff, among others] in the competitive range due to their marginal technical scores."[12] Nevertheless, he decided to retain these firms within the competitive range in order to give them an opportunity to improve their technical scores.

Once discussions were complete, the offerors submitted best and final offers (BAFOs) on or before September 10, 1997. Following the receipt of the BAFOs, however, Mr. Kraus determined that "[d]ue to the price disparity among the offerors found within the competitive range, discussions [should] be re[-]opened," and thus requested a second round of BAFOs on October 21, 1997.[13] Upon evaluating these BAFOs, Mr. Kraus determined that "MVM's proposal is most advantageous to the Government and accordingly should receive the contract award."[14] He noted that three offerors had higher technical scores as compared with MVM, but determined that the technical differences did not "warrant paying a premium in price."[15] Plaintiff ranked fifth among all offerors.[16]

7. *Id.*, Tab 5i, at 5, 7–9.

8. *Id.*, Tab 5g, at unnumbered page 2.

9. *Id.*

10. *Id.*, Tab 5e, Negotiation Memorandum at unnumbered page 2.

11. *Id.*, Tab 5b, at 1–2.

12. *Id.*, Tab 5e, Negotiation Memorandum at 4–5.

13. *Id.*, at 9.

14. *Id.*, at 11.

15. *Id.*

16. *Id.*, at 10.

As a result of an internal review, however, the Contract Specialist, Carolyn Hendrick, and Mr. Kraus found that plaintiff and MVM "inadvertently omitted a few labor rates from their BAFO[s]." [17] In light of the omissions, they determined that a third round of negotiations was necessary. [18] The conclusions derived from this third round were embodied in a document entitled "Negotiation Memorandum–3rd Round." According to this document, Ms. Hendrick and Mr. Kraus "determined that the competitive range shall include MVM, [plaintiff], and Akal, Security [Inc. (Akal)].... The remaining offerors do not have a reasonable chance of receiving an award and therefore are eliminated from the competitive range because of price." [19] With regard to the remaining three offerors within the competitive range, plaintiff offered the lowest evaluated cost. [20]

Following the third round of BAFOs, Mr. Kraus and Ms. Hendrick determined: (1) MVM had a weighted score of [* *] and evaluated cost of $70,802,032.84; (2) Akal had a weighted score of 95 and an evaluated cost of $71,156,340.96; and (3) plaintiff had a weighted score of 87.40 and an evaluated cost of $71,029,704.40. [21] They concluded that, although MVM did not receive the highest weighted score, its "proposal is most advantageous to the Government and accordingly should receive the contract award." [22] Importantly, they noted "[t]here are no superior technical advantage between MVM and Akal that warrants a premium in price." [23] No comparative analysis was undertaken with regard to plaintiff's and MVM's proposals. On January 20, 1998, defendant awarded the contract to MVM.

On the next day, Ms. Hendrick sent a letter to plaintiff notifying it that it was not awarded the contract. The letter provides, in pertinent part:

A total of 72 offers was solicited and 18 proposals were received in response to the [RFP]. The evaluated price of the wining [sic] proposal is $70,802,032,84 [sic]. Your total evaluated price is $71,029,704.40. Your proposal was not selected for an award because your evaluated price is $227,671.56 above the awardee. [24]

In response to the letter, plaintiff's president, William Guidice, contacted Ms. Hendrick because he believed that plaintiff's evaluated price had been incorrectly calculated. During their conversation, Ms. Hendrick purportedly informed Mr. Guidice that, had plaintiff been the lowest priced offeror, it would have been awarded the contract. According to Mr. Guidice, Ms. Hendrick intimated that price had been the determinative factor for award in this procurement. In this regard, Mr. Guidice informed Ms. Hendrick that plaintiff's price was actually lower than MVM's, and thus, it should have been awarded the contract. Following their conversation, Mr. Guidice faxed calculations to Ms. Hendrick in support of his position. Ms. Hendrick confirmed that the calculations were correct, but nevertheless, on January 23, 1998, Ms. Hendrick informed plaintiff that the contract award would remain with MVM.

In support of this decision, Ms. Hendrick generated a "Memorandum to File," outlining the reasons for not disrupting the contract award to MVM. Specifically, she noted that, although the contract award would ordinarily go to the lowest priced offeror, Mr. Kraus identified technical advantages which substantiated the award to MVM. [25] Specifi-

17. *Id.*, Negotiation Memorandum–3rd Round at 1. The Contract Specialist on this procurement did not have authority to bind the government. Rather, she evaluated proposals and made recommendations to the Contracting Officer who, did in fact, have authority to bind the government. *See* Transcript (Tr.) at 174–75.

18. A.R., Tab 5e, Negotiation Memorandum–3rd Round at 1.

19. *Id.*, at 2.

20. *Id.*

21. *Id.*, at 4.

22. *Id.*

23. *Id.*, at 5.

24. *Id.*, Tab 9, at unnumbered page 4.

25. *Id.*, Tab 5a, Memorandum to File, at unnumbered page 1.

cally, MVM offered advantages in: (1) background investigation and verification of employees' record of experience; (2) limiting turnover; and (3) providing a comprehensive implementation plan.[26] Moreover, Ms. Hendrick expounded that "although [plaintiff] offers the lowest price, [its] proposal is inferior to MVM's, and in some instances [plaintiff's] management approach is less than sound." [27] She concluded: "[a]fter re-visiting [plaintiff's] technical offer, the Contracting Officer determined that the award should remain with MVM." [28]

Plaintiff filed suit in this court on January 30, 1998, seeking a temporary restraining order and a preliminary injunction.[29] In its complaint, plaintiff seeks an order terminating the contract awarded to MVM and an order re-awarding the contract to plaintiff. On March 12, 1998, plaintiff filed its motion for a permanent injunction[30] and defendant filed its motion for summary judgment on the administrative record on March 20, 1998. In addition, on April 3, 1998, MVM filed a motion joining in the factual statements and arguments presented by defendant. The court took testimony and heard oral argument on the parties' motions between April 29, 1998, and May 1, 1998.

*Discussion*

Although plaintiff filed a motion for a permanent injunction, the court will treat it as one for summary judgment upon the administrative record. Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc., v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014

---

26. *Id.*, at unnumbered pages 2–3.

27. *Id.*, at unnumbered page 2.

28. *Id.*

29. On February 19, 1998, plaintiff filed a motion to take the deposition of the Contracting Officer and the Contract Specialist. The court granted

plaintiff's motion on February 23, 1998. *See United Int'l Investigative Servs. Inc. v. United States*, 41 Fed.Cl. 312 (1998).

30. Pursuant to a telephonic conference held with the parties on April 3, 1998, plaintiff agreed that it would file a motion to re-name its motion for a preliminary injunction as one for summary judgment. Plaintiff did not file that motion.

(1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc., v. United States*, 33 Fed.Cl. 514, 518 (1995). It, therefore, does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman*, 26 Cl.Ct. at 1014).

Congress amended the Tucker Act in 1996 by granting this court jurisdiction to hear post-award bid protest actions. 28 U.S.C.A. § 1491(b) (West Supp.1997). The court reviews the challenged agency decisions according to the standards set out in the Administrative Procedures Act (APA), 5 U.S.C. § 706 (1994). The court must determine whether defendant's actions toward plaintiff were:

> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law.

5 U.S.C. § 706(2).

■ In determining whether the agency has acted arbitrarily or capriciously toward plaintiff, the court must consider four factors. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974). Specifically, the court must determine whether: (1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.* at 1203–04; *see also Aero Corp., S.A. v. United States*, 38 Fed.Cl. 739, 749 (1997). There is, however, "no requirement or implication . . . that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville*, 859 F.2d at 911.

■ Whenever the government solicits proposals or invites bids, it enters into an implied-in-fact contract with the offerors to treat them fairly and honestly. *ECDC Environmental, L.C. v. United States*, 40 Fed.Cl. 236, 240 (1998); *see IMS Servs., Inc. v. United States*, 33 Fed.Cl. 167, 178 (1995); *Crux Computer Corp. v. United States*, 24 Cl.Ct. 223, 225 (1991). This implied-in-fact contract between the government and bidders on the underlying contract requires the government to fully and fairly consider all bids submitted in accordance with the invitation for bids. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir.1996); *Ingersoll–Rand Co. v. United States*, 2 Cl.Ct. 373, 375 (1983).

■ The court's authority to grant declaratory relief in this case is limited to a determination of whether the government breached its implied contract of fair dealing with plaintiff. *Ingersoll–Rand*, 2 Cl.Ct. at 376; *see also Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir. 1995) ("only violations that amount to a breach of the government's implied contract to consider an offer fairly and honestly will support the court's exercise of its injunctive powers"). "To establish such a breach, the plaintiff bears the burden to show, by clear and convincing evidence, that no reasonable basis exists for the decision of defendant's procurement officials, or that the procurement process involved a clear and prejudicial violation of applicable statutes and regulations." *ECDC*, 40 Fed.Cl. at 241; *see also Day & Zimmermann Servs., Inc. v. United States*, 38 Fed.Cl. 591, 597, *appeal dismissed*, 132 F.3d 49 (Fed.Cir.1997). It is within these parameters that plaintiff must show that defendant's actions toward plaintiff were arbitrary and capricious such that defendant breached its implied duty of fair dealing with plaintiff. *Aero*, 38 Fed.Cl. at 749; *see also 126 Northpoint Plaza Ltd. Partnership v. United States*, 34 Fed.Cl. 105, 107, *appeal dismissed*, 73 F.3d 379 (Fed.Cir.1995); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).

When reviewing agency action, the APA requires a "thorough, probing, in-depth review" to determine "whether the decision

was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The scope of administrative review is limited to the administrative record developed by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). The court, however, may allow the parties to supplement the administrative record in certain limited situations. *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 408, 411 (1997). Specifically, the court may consider "extra-record" evidence:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)).

In the present case, the court allowed plaintiff to depose Mr. Kraus and Ms. Hendrick. The court directed that these depositions be limited to: (1) the contents of Ms. Hendrick's notification letter to plaintiff, dated January 21, 1998; (2) the content of the discussion between Ms. Hendrick and Mr. Guidice of that date; (3) whether price was a determinative factor for contract award; and (4) whether there was a re-visiting of plaintiffs technical evaluation after it was determined that plaintiffs price was lower than MVM's price. Moreover, the court conducted a limited hearing in order to determine whether defendant breached its implied-in-fact contract to fully and fairly consider plaintiffs proposal.

Plaintiff argues that the re-scoring of plaintiff's technical proposal by Mr. Guccione, as a single TEB member, was neither authorized nor permitted by the rules for scoring proposals. Plaintiff contends that this improper scoring was prejudicial to plaintiff. In response, defendant maintains that the initial TEB scoring was flawed because the evaluators failed to identify any weaknesses among the five proposals within the "Acceptable" category. As a result, the TEB chairman directed two TEB members to "assure that the scoring given to the offerors w[as] warranted in merits and supporting data as stated in the [RFP].' " [31] Defendant further notes that, although this second process did not mirror the process contemplated in the solicitation, it nevertheless resulted in a far more comprehensive and detailed report.

The agency has a fundamental statutory obligation to "obtain full and open competition through the use of competitive procedures." 10 U.S.C. §§ 2304(a)(1)(A), 2305(a)(1)(A)(i) (1994). In this regard, the agency must "evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1) (1994); *see also* 48 C.F.R. § 15.608(a) (1997).

The court starts with the presumption that contracting officials act correctly, honestly, and in good faith when considering bids. *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663, 671 (1997); *see also Alfa Laval Separation, Inc. v. United States,* 40 Fed.Cl. 215, 221 (1998). Their discretion is especially broad where, as is the case here, the contract was awarded through negotiated procurement. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988); *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985); *see also Lockheed Missiles & Space Co. v. Bent-*

---

31. Defendant's Motion for Summary Judgment on the Administrative Record and Opposition to Plaintiff's Motion for a Permanent Injunction at 29 (quoting A.R., Tab 5e 2nd Round Negotiation Memorandum).

*sen,* 4 F.3d 955, 958–59 (Fed.Cir.1993) ("[e]f-fective contracting demands broad discretion"). Thus, the court's review of these actions is quite limited. *CACI,* 13 Cl.Ct. at 725; *see also Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985).

In the case at bar, the RFP informed offerors that their technical proposals would be evaluated by a TEB. The Technical Evaluation, although not specifically located within the RFP, directed the TEB members to first independently compare the relative strengths and weaknesses of each offeror's proposal.[32] The TEB members were then required to conduct a group discussion with regard to each proposal. The purpose of this group discussion was to arrive at a consensus regarding each offeror's proposal, followed by a merging of the independent technical evaluations into a summary report. Importantly, if any TEB member adjusted his or her evaluation after their initial individual evaluation as to a particular offeror, they were to complete a separate evaluation form specifically indicating the reasons for the revision.

The TEB, which convened in June 1997, followed these directions. Each TEB member individually evaluated the technical proposals of each offeror. Significantly, one of the evaluators, Mr. Guccione, awarded plaintiff's technical proposal 58 points out of a possible 60. The results from all the evaluators were then merged into a summary report prepared by the chairman, Mr. Rouille. In that report, Mr. Rouille indicated that the TEB, consisting of six members, evaluated the proposals and gave an overview of the content of the offerors' proposals. The report reflected that plaintiff's proposal merited a score of 56.67, ranking it tied for second overall, and MVM's proposal merited a score of [* *], ranking it [* *] overall. Mr. Rouille also provided a comparative analyses regarding the strengths of the top five offerors, but enunciated weaknesses with regard to only one of these offerors, General Security Services Inc.

Nevertheless, two months later, Mr. Guccione and Mr. Viti, two members of the original six-member TEB, were directed to re-evaluate these proposals. During this re-evaluation, Mr. Guccione, who had initially determined that plaintiff's technical proposal merited a score of 58, re-evaluated that proposal and reduced plaintiff's score by more than fifteen percent, to 49. A number of the other offerors' technical proposals, including MVM's, were also re-evaluated by either Mr. Guccione, Mr. Viti, or both.

The results from this re-evaluation were then incorporated into a revised TEB report authored by Mr. Rouille, and dated August 25, 1997. Mr. Rouille provided a comparative analyses of the relative strengths and weaknesses of all eighteen offerors's technical proposals. Despite the re-evaluation being conducted by only two of the original six members of the TEB, Mr. Rouille identified the report as the work product of the six-member TEB which convened in Vermont in June. Significantly, the score of 49, which Mr. Guccione awarded to plaintiff as a result of his re-evaluation of that proposal, was attributed to all the TEB members. In doing so, the report misleadingly indicates that each TEB member individually determined that plaintiff's technical proposal warranted a score of 49.

At the hearing conducted in this matter, Ms. Hendrick testified that the first report "was inadequate."[33] She explained that the "[t]he [first] technical evaluation report did not identify as to weaknesses and deficiencies and the strengths of each and every offeror on the report."[34] Moreover, Ms. Hendrick testified that she "personally had a problem with their technical evaluation report because it was a gripe letter, and it should not have been a part of a response to a technical evaluation board."[35] In this regard, she articulated:

> [T]he Agency as a whole was concerned about the report they received. Therefore, I was instructed to call each and every

---

32. The parties do not dispute that the agency was bound by the requirements of the Technical Evaluation. *See* Tr. at 25, 621.

33. Tr. at 211.

34. *Id.*

35. *Id.* at 211–12.

individual that sat on the [TEB]. They could not come, they could not return to evaluate the proposals again.... [O]nly two people were able to come back ... [a]nd the Chairperson agreed with those two.[36]

With regard to the two members who returned to re-evaluate the scores rendered from the first TEB, Ms. Hendrick testified: they "came back to realign or to substantiate the scores that were actually given by the first Board."[37]

Quite clearly, however, the Technical Evaluation envisioned a group effort that would premise its conclusions not on one individual, but rather, on a collective bases. Indeed, the Technical Evaluation specifically states that "[t]he TEB should have at least three members" who will arrive at a consensus with regard to each offeror's technical proposal.[38] Defendant complied with this process in the first evaluation.

Moreover, neither Ms. Hendrick, nor the Contracting Officer, was obligated to accept the recommendations of the TEB. The RFP specifically cautions that the "TEB is only advisory and the Contracting Officer retains the ultimate authority to determine the technical evaluation of each proposal."[39] Nothing in the record, however, indicates that either Ms. Hendrick or the Contracting Officer disavowed the findings and conclusions of the TEB and exercised his/her authority to determine the technical merit of each proposal. Rather, Ms. Hendrick merely elevated two of the original six-member TEB to *super-evaluators*, and then ascribed the scores of these two evaluators to each member of the TEB. This was clearly improper. It circumvented the purpose of the TEB's function to collectively assess the relative worth of each offeror's technical proposal and arrive at a consensus score.

Further, the court notes there is no discernable explanation on this record explaining why Mr. Guccione would initially evaluate plaintiff's proposal and award it a score of 58, subsequently re-evaluate that same proposal, and then determine that it warranted a fifteen percent reduction in score. Mr. Guccione did not complete a separate evaluation form delineating the reasons for his changed opinion, as required by the Technical Evaluation. Moreover, the underlying evaluation criteria remained the same for both the first and second technical evaluations. Plaintiff's technical proposal remained the same. Yet, plaintiff's score dropped eight points.[40]

In addition, the evaluation of plaintiff's proposal could potentially have benefitted from a group discussion. As stated above, Ms. Hendrick identified the following areas of plaintiff's technical proposal as deficient when compared to MVM's technical proposal: (1) background investigation and verification of employees' record of experience; (2) limitation of turnover; and (3) comprehensive implementation plan.

A comparison of the comments provided by Mr. Guccione from his re-evaluation of plaintiff's proposal with the comments made by the original TEB, however, demonstrate that a group discussion could have been useful. For example, with regard to the first area identified by Ms. Hendrick, Mr. Guccione observed: "Offeror[']s procedure to perform background checks does not fully meet the standards expected by the gov[ernmen]t.... [Offeror] does not provide an in-depth discussion on how background checks will be performed."[41] A sampling of the comments made by the other evaluators in the initial evaluation, however, provide: (1) "offeror far exceeds req[uirement] as set forth by gov[ernmen]t;" (2) "meets the requirements

---

**36.** *Id.* at 213–14. Ms. Hendrick stated: "[i]t was basically a management decision to have the Board reconvene." *Id.* at 316.

**37.** *Id.* at 215.

**38.** A.R., Tab 5i, at 5, 7.

**39.** *Id.,* Tab 6, at M–3.

**40.** No separate evaluations for Mr. Guccione were provided representing his work product

from the first TEB evaluation and the subsequent re-evaluation. Rather, the court was provided with only one report from Mr. Guccione, representing his work product from the re-evaluation. It appears that Mr.Guccione merely took his first evaluation, crossed out the old scores, added new scores, and changed some commentary.

**41.** *Id.,* Tab 5c, evaluator's worksheet at 21.

but does not exceed;" (3) "exceeds what is expected[,][g]reat benefit of [sic] to the gov[ernmen]t;" and (4) "offeror[']s procedure for checks is thorough." [42]

Regarding the second area, limiting turnover, Mr. Guccione made the following somewhat inconsistent comments: "Evidence is provided to indicate the offeror has benefits that will encourage employees to remain with the offeror. These benefits do not provide enough incentive for employees to remain with [the offeror] for a substantial period of time." [43] The other evaluators, however, stated: (1) "offeror far exceeds req[uirements];" (2) "has exceptional procedures in place to limit turnovers;" (3) "exceptional procedures to limit turnover;" and (4) "shows methods of limiting turnover *i.e.* incentives monthly, quarterly and yearly." [44]

Finally, with regard to plaintiff's implementation plan, Mr. Guccione provided the following wholly contradictory commentary: "Offeror[']s selection process *exceeds* the gov[ernment']s requirements.... The [offeror's] selection process *has not exceeded* the gov[ernment']s requirements." [45] The other evaluators had the following comments regarding plaintiff's implementation plan: (1) "offeror exceeds req[uirements] as set forth by the gov[ernmen]t;" (2) "exceeds the requirements of the government;" (3) "more than exceeds requirements;" and (4) "very extensive.... definite benefit to the gov[ernment]." [46]

A group discussion, as envisioned by the Technical Evaluation, could have clarified these inconsistencies. Specifically, the discussions could have been used to ventilate Mr. Guccione's perceived concerns regarding plaintiff's technical proposal and the TEB could have come to a consensus regarding each area of concern. The failure of Ms. Hendrick to provide an opportunity for the TEB to operate this function denied plaintiff "the impartial consideration to which it was

entitled under the implied contract obligations of the government." *Arrowhead Metals, Ltd. v. United States,* 8 Cl.Ct. 703, 714 (1985); *see also 126 Northpoint Plaza,* 34 Fed.Cl. at 112.

Defendant, however, argues that the reevaluation resulted in a more comprehensive product than the first evaluation, and that it resulted in a far more thorough analysis of the proposals. The court finds this argument unpersuasive. There is no way of knowing how comprehensive the second process actually was because it did not include a group discussion. The group discussion, as demonstrated above, was necessary in order to ventilate the evaluators' opinions regarding each proposal. During these discussions, evaluators could have explained their individual reasons for ascribing a score to a particular proposal. Moreover, the TEB, as a group, would then have been able to arrive at a consensus regarding that particular aspect of an offeror's proposal.

Although minor irregularities or errors in the procurement process are not sufficient grounds to warrant judicial intrusion to overturn a procurement decision, *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996), the violation in this case was not minor. Rather, the violation described above deprived plaintiff of the opportunity to have its proposal considered fairly and honestly. Thus, the decision to have two evaluators circumvent the consensus and discussion requirements of the Technical Evaluation merits judicial intrusion.

■ In order "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996); *see also Central Arkansas,* 68 F.3d at 1342 (only clear and prejudicial violations warrant relief). "This requires that, had it not been for the statutory or regulato-

---

**42.** *Id.,* Tab 5h, evaluators' worksheets at 21. The comments by Mr. Rouille are illegible.

**43.** *Id.,* Tab 5c, evaluator's worksheet at 61.

**44.** *Id.,* Tab 5h, evaluators' worksheets at 61. The comments made by Mr. Rouille are essentially

illegible, although he does state, in legible part, "offeror has great...."

**45.** *Id.,* Tab 5c, evaluator's worksheet at 5.

**46.** *Id.,* Tab 5h, evaluators' worksheets at 5. The comments made by Mr. Rouille are illegible.

ry violation, 'there was a reasonable likelihood that the protester would have been awarded the contract.'" *Candle Corp. v. United States*, 40 Fed.Cl. 658, 665 (1998) (quoting *Data Gen.*, 78 F.3d at 1562); *see also Day & Zimmermann*, 38 Fed.Cl. at 597; *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 471 (1997).

██ As a result of the initial TEB evaluation, plaintiff's technical proposal received a higher score than MVM's technical proposal. Moreover, plaintiff's evaluated cost was less than that of MVM, the eventual awardee of the contract. In a scenario such as this, where plaintiff had a higher technical score and a lower evaluated cost, there is a reasonable likelihood that plaintiff would have been awarded the contract. In addition, Ms. Hendrick testified that she relied upon the report derived from the improper re-scoring of plaintiff's technical proposal.[47] Plaintiff has thus demonstrated that it was prejudiced by the above-described error.[48]

██ Having concluded that the instant procurement process was legally flawed, and that plaintiff was thereby prejudiced, the court must determine whether plaintiff is entitled to injunctive relief. Plaintiff must make three additional showings for injunctive relief: (1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting the relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *ATA Defense Indus., Inc. v. United States*, 38 Fed.Cl. 489, 505 n. 10 (1997) (the "factors are the same as those considered for a preliminary injunction"); *see also Day & Zimmermann*, 38 Fed.Cl. at 610; *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 795 (1991).

With regard to the first consideration, the opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm. *Magna-*

*vox Electronic Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1379 (1992); *see also TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl.Ct. 33, 73 (1989). Indeed, plaintiff has represented to the court that it is losing in excess of $40,000 each day that an injunction does not issue.[49] Therefore, plaintiff has adequately demonstrated that it will suffer irreparable harm.

The public has an interest in "minimizing the costs of federal procurements." *Vanguard Sec. Inc. v. United States*, 20 Cl.Ct. 90, 113 (1990). Moreover, the public has a strong interest in preserving the integrity of the procurement process. *See Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1153 (Fed.Cir.1994); *see also PCI/RCI v. United States*, 36 Fed.Cl. 761, 776 (1996) (the public interest in protecting the integrity of the procurement system from irrational conduct is served by granting a permanent injunction). The issuance of an injunction would protect these interests.

Finally, the court must consider the relative harm to plaintiff with the harm caused to the government and third parties. *See FMC Corp.*, 3 F.3d at 427. In this regard, defendant ensures that security services are provided for all judges, court personnel, jurors, witnesses, attorneys, and the general public within the Second Judicial Circuit. It is imperative that defendant ensure uninterrupted security services to these individuals and any injunctive relief fashioned by the court must carefully consider these respective interests. Thus, any unnecessary transitional difficulties should be kept to a minimum.

The court is mindful that it should exercise its equitable powers "'in a way which best limits judicial interference in contract procurement.'" *Stapp Towing Inc. v. United States*, 34 Fed.Cl. 300, 305 (1995) (quoting *United States v. John Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)). Moreover, "[t]he court ... should not select a contrac-

---

**47.** *See* Tr. at 500, 560.

**48.** Plaintiff also argues that the multiple best and final offers in this case were improper and that, as the lowest priced offeror, plaintiff should have been awarded the contract. Because the court

considers the re-evaluation sufficiently erroneous to merit judicial intrusion, it does not address plaintiff's other arguments.

**49.** *See* Tr. at 667.

tor or award specific performance of a contract." *Hydro Engineering,* 37 Fed.Cl. at 461; *see also Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 869 (D.C.Cir.1970) ("the ultimate grant of a contract must be left to the discretion of a government agency; the court will not make contracts for the parties").

 Plaintiff, however, argues that the court should direct the award of the contract to plaintiff and relies on *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197 (D.C.Cir. 1984), in support of its position. In *Delta Data,* the court noted:

[A] court may not order the award of a contract unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award.

*Id.* at 204. In the present case, there is no guarantee that, but for the wrongful re-scoring of plaintiff's technical proposal, plaintiff would have been awarded the contract. Importantly, the RFP cautions that the Contracting Officer has the ultimate authority to evaluate each offeror's technical proposal. Under these circumstances, the Contracting Officer must be left with the discretion to rely upon, or repudiate, the work product of the TEB. A directed award by this court would usurp the Contracting Officer's authority under the RFP and, therefore, would be improper.

The court thus finds that the appropriate injunctive relief is to limit defendant from exercising its option with MVM to extend the subject contract beyond the initial term. This initial term is scheduled to conclude on September 30, 1998. At that time, this contract shall be terminated. Defendant has represented to the court that it has already commenced the process of re-soliciting for the services covered by this contract and expects to award a new contract by October 1, 1998. The court is confident that the government will expedite this re-solicitation to ensure that the new awardee shall begin performance by said date.

### Conclusion

For the above-stated reasons, the court concludes that plaintiff has demonstrated, by clear and convincing evidence, that defendant acted unreasonably in allowing an individual TEB member to re-score plaintiff's technical proposal. Thus, plaintiff's motion for a permanent injunction is granted in accordance with this opinion and defendant's motion for summary judgment on the administrative record is denied. In consideration of the above,

IT IS ORDERED:

1. Plaintiff is entitled to bid preparation costs. *See* 28 U.S.C.A. § 1491(b)(2); *see also Keco,* 492 F.2d at 1203–04. The parties shall file a stipulation by July 6, 1998, representing such costs.

2. Defendant is enjoined from exercising its option on RFP No. MS–CSC–97–R–0002, thereby ending the term of the contract on September 30, 1998. On that date, said contract shall be terminated.

3. Defendant shall continue proceeding with re-solicitation for services covered by the subject contract and award said contract in time to commence performance on October 1, 1998.

4. This opinion shall be published as issued after July 6, 1998, unless the parties identify protected and/or privileged materials subject to redaction prior to said date.

Upon receipt of the parties' stipulation regarding bid preparation costs, the Clerk shall enter judgment accordingly without further order of the court. No costs.