UNITED INTERNATIONAL IN-
VESTIGATIVE SERVICES,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–153C.

United States Court of Federal Claims.

Oct. 21, 1998.

Alan M. Grayson, McLean, Virginia, for plaintiff.

Matthew D. Lee, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION AND ORDER[1]

WEINSTEIN, Judge.

This post-award bid protest case, brought pursuant to the court's recently expanded jurisdiction under 28 U.S.C. § 1491(b)(1), section 12 of the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, 110 Stat. 3870, 3874–75 (1996), is before the court on cross-motions for summary judgment on the administrative record. On

November 24, 1997, a contract to provide security services for the courts in the first federal judicial circuit was awarded to MVM, Inc. by the United States Marshals Service (USMS) within the Department of Justice pursuant to Solicitation No. MS–CSC–97–R–0001.[2]

Plaintiff's application for a Temporary Restraining Order (TRO), which was not filed until March 13, 1998 (nine days after the complaint), and its application for a preliminary injunction were denied on March 25, 1998, following a hearing held on March 23, 1998, on the grounds that plaintiff failed to establish the need for emergency injunctive relief (plaintiff was unable satisfactorily to explain the nine-day delay between the filing of its complaint and the filing of its application for a TRO, or between its notice of the amount of the bid of the awardee the day after the award) and that defendant would suffer irreparable harm if the TRO were granted.

■ Plaintiff's allegation of harm (that it would suffer an "unjust loss of a valuable business opportunity with the Government") does not rise to the level of the irreparable harm that must be shown to receive injunctive relief. *See Zenith Radio Corp. v. United States,* 710 F.2d 806, 810 (Fed.Cir.1983) (implying that irreparable injury sufficient to justify injunctive relief requires a showing of more than just economic harm). *See also Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 938 (9th Cir.1987); *Ohio ex. rel. Celebrezze v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 291 (6th Cir.1987); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958).

1. This opinion was originally filed under seal on August 3, 1998. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. Only *amicus curiae,* MVM, Inc. (MVM), proposed redactions. The court did not make any of the proposed redactions because (1) MVM is not a party to this case and, therefore, has no standing to object to disclosure; (2) MVM failed to establish that it would be harmed by the disclosure; and (3) deletion of MVM's proposed redactions would render meaningless the court's discussion of the appropriateness of the contracting officer's actions in this procurement.

2. Plaintiff United International Investigative Services, Inc. (UIIS), filed a "Complaint for Declaratory and Injunctive Relief" on March 4, 1998, protesting the allegedly unlawful rejection of its lowest-priced bid. Plaintiff also filed notice of an allegedly related case, *United Int'l Investigative Servs., Inc. v. United States,* a then-pending bid protest case involving plaintiff and a different, but similar, contract. *See United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312 (Fed.Cl. July 7, 1998) (granting summary judgment to protester UIIS on the grounds that UIIS was prejudiced by the agency's improper re-scoring of its proposal). Both courts declined the parties' suggestions for reassignment.

Plaintiff has not been deprived of an opportunity to compete for an award, which does constitute irreparable harm, but only of the award.

A protective order in the form agreed to by the parties was entered on April 18, 1998. Plaintiff filed a motion for summary judgment on April 28, 1998. Defendant cross-moved for summary judgment on May 14, 1998. MVM, Inc. (MVM), the awardee of the contract, was denied leave to intervene, *see* Order issued March 25, 1998, but was permitted to participate as *amicus curiae*.

After an evidentiary hearing and oral argument on May 26, 1998, and upon reviewing the Administrative Record (AR) and the parties' briefs, the court concludes that plaintiff's claims do not merit relief. Accordingly, for the reasons discussed, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.

### Facts

The relevant facts set out below are not in dispute.

Plaintiff submitted a proposal on March 27, 1997, in response to the USMS' Request for Proposals (RFP) to provide security guard services for the federal courthouses located within the first federal judicial circuit, which includes the federal district courts of Maine, New Hampshire, Massachusetts, Rhode Island, and Puerto Rico. The contract base year performance period was December 1, 1997 through September 30, 1998, with four additional option years. The agency awarded the contract to MVM on November 24, 1997. Plaintiff protests that award.

According to section M of the RFP, defendant intended to award the contract to the offeror whose proposal was "determined to be in the best interests of the Government, price and other factors considered." RFP § M-4. The agency reserved the right to make an award on the basis of initial proposals without holding discussions. RFP § M-3. Proposals were to be awarded up to 60 (out of 100) points for three technical factors (company management, past related performance, and qualifications of key personnel)

and up to 40 points for price factors. RFP §§ M-7, M-8. The RFP stated that, as between "substantially equal technical" proposals, price would be the determining factor. RFP § M-9. The RFP also provided for the establishment of a Technical Evaluation Board (TEB) to review and evaluate the technical proposals. RFP § M-6. Each TEB member was to assign a numerical score to each criterion. *Id.* The scores of the members were to be averaged to reach the number of technical points. *Id.* The RFP specifically noted, however, that the TEB evaluation was "only advisory" and "the contracting officer (CO) retains the ultimate authority to determine the technical evaluations of each proposal." *Id.*

The TEB's instructions and procedures provided that "the results of the [members'] technical evaluations are merged into a summary report subsequent to a group discussion attended by all TEB members." Administrative Record (AR) 2303 (instructions entitled "USMS, Procurement Division, Technical Evaluation of Proposals for Negotiated Procurements"). The stated purpose of this discussion was to note specific elements overlooked by another evaluator, and to arrive at a consensus concerning each proposal and the score to be applied. AR 2303. A separate evaluation form was to be completed whenever a TEB member adjusted his or her evaluation. AR 2304. RFP section M-8 also required the agency to establish a "total evaluated price," worth 40 points. RFP § M-8. The total evaluated price was not the same as the actual stated price of a proposal. The total evaluated price was to consist of the basic contract period price (to be calculated by multiplying proposed unit prices by their corresponding estimated quantities) and the option period prices. RFP § M-8. Calculation of the total evaluated price also included the government's reserved right to perform a cost realism analysis to minimize "potential or built-in cost growth," and the addition of $1,895 (for evaluation purposes only) to an offeror's proposal for each proposed new court security officer added at the contract start date. RFP § M-8. The CO would decide whether any differences in technical scores between acceptable proposals warranted paying a

price premium. RFP § M–9. Between substantially equal technical proposals, the proposed price would be the determining factor. *Id.*

After the initial TEB evaluation, plaintiff's proposal was one of seven "acceptable as submitted" technical proposals, out of the 15 proposals received in response to the RFP. The average technical scores for each of the seven proposals were as follows:

| Offeror | Average Technical Score |
|---|---|
| UIIS | 58.75 |
| DynBorg Security | 58.00 |
| Pinkerton Security | 57.50 |
| General Security | 56.00 |
| AKAL Security | 55.75 |
| MVM | 54.50 |
| First Security | 49.75 |

UIIS received the highest average technical score and offered the lowest price.

During the week of July 28, 1997, the technical proposals were rescored by Charles Moore, a member of the TEB. AR at 2326. Mr. Moore reviewed all of the technical proposals to "ensure that the scores applied were based solely on the factors stated in Section L and M of the solicitation." AR at 2326. After his review, Mr. Moore, in a "Final Technical Report," announced new technical scores, as follows:

| Offeror | Revised Technical Score |
|---|---|
| AKAL Security | 58.00 |
| Pinkerton Security | 57.00 |
| General Security | 56.00 |
| MVM | 55.00 |
| DynBorg Security | 53.00 |
| UIIS | 53.00 |
| First Security | 47.00 |

In an August 18, 1997 letter to the CO, the TEB reported the results of the re-scoring, and represented them as reflecting a consensus of the TEB members. AR 2923. The TEB again designated all seven proposals (including plaintiff's and MVM's) as acceptable as submitted. AR 2923. Another proposal was found conditionally acceptable, while the other seven proposals were deemed unacceptable. AR 2923.

The TEB's "Final Technical Report," issued on August 18, 1997, stated the TEB's consensus that all seven acceptable offerors "were equal in strengths with some difference [sic] that offered benefit [sic] to the Government and were not considered to have weaknesses in any areas for form or substance." The TEB report did not expressly identify the seven proposals as technically substantially equal. The "Final Technical Report" found no weaknesses or deficiencies, and noted that no clarifications were requested, with respect to any of the seven acceptable offers.

Defendant subsequently ordered four separate rounds of BAFOs.[3] In the first round, on August 15, 1997, defendant requested "clarification" from MVM, DynBorg, and plaintiff, and notified the other four "acceptable as submitted" offerors that, due to cost, their offers would no longer be considered for award. The scores on this round were as follows:

| Offeror | Price | Price Score (max.40) | Tech. Score (max.60) | Total Score (max.100) |
|---|---|---|---|---|
| DynBorg | $31.27M | 40.00 | 53.00 | 93.00 |
| UIIS | $31.58M | 39.89 | 53.00 | 92.89 |
| MVM | $34.01M | 36.77 | 55.00 | 91.77 |

---

**3.** Plaintiff suggested in its briefs and at oral argument that defendant actually called for five rounds of BAFOs, but did not adequately explain this calculation. In its November 13 addendum to the price negotiation memorandum, the agency listed three rounds of BAFOs (submitted on August 19, August 21, and October 23, 1997). AR 2318. In addition, the agency noted that the offerors submitted price "revisions" on another (unspecified) date in August, 1997 based on written discussions, and on October 3 based on the written discussions of September 29, 1997. AR 2318. In this opinion, references to specific BAFO rounds conform to the BAFOs defined in the administrative record as follows: (1) submissions requested by the agency on August 15, 1997 constitute BAFO 1 (see AR 2843–49); (2) submissions requested on August 22, 1997 constitute BAFO 2 (see AR 2851–54); (3) submissions requested on September 29, 1997 (and revised on September 30) constitute BAFO 3 (see AR 2856–75); and (4) submissions requested on October 20, 1997 constitute BAFO 4 (see AR 2878–84).

Thus, DynBorg, not UIIS or MVM, had the lowest price and the highest overall score of the three offerors. On August 22, 1997, after receiving responses to its "requests for clarification" from MVM, DynBorg, and plaintiff, the three lowest-priced offerors, defendant called for a second round of BAFOs. None of the three offerors made any revisions to its total offered price in this second BAFO submission.

The USMS' informal Policy/Procedures Review Board (Review Board or Board) conducted several reviews of the internal policy/procedures involved in the selection of an awardee. On September 18 and 25, 1997, the Review Board indicated that the CO, before eliminating the other four "acceptable as submitted" offerors from the competition, should have conducted "meaningful discussions" with all offerors within the competitive range as required by FAR § 15.610(b).[4] Accordingly, by letters dated September 29, 1997, defendant notified the seven originally-acceptable offerors that their proposal prices were too high, and that it was revising the solicitation and reopening negotiations. The letters requested a third BAFO round, due on October 1, 1997 (later extended to October 3, 1997). The offerors' revised their prices in the third BAFO submissions: UIIS' price was $29.93 million; DynBorg's $34.50 million and MVM's $31.82 million.

By letter dated October 9, 1997 the CO notified all offerors of the Marshals Service's recent adverse experience, under another Court Security Officer contract for a different circuit, when security services were disrupted. The October 9 letter did not solicit BAFOs, and merely "reminded" the offerors that the solicitation required 100% minimum staffing and that "strikes, walkouts, work slow downs, low morale, resignations, massive turnover or other problems as a result of contracting [with any offeror] is not acceptable performance." The October 9 letter also stated that it was providing the offerors

"with an opportunity to review your price and/or technical proposal for areas that are not in the best interest of this program."

A subsequent letter dated October 17 notified the bidders that the October 9 letter was "informational only." An October 20 letter closed discussions and invited offerors to submit a fourth BAFO by October 23, 1997. It did not solicit revisions to technical proposals. Plaintiff's fourth BAFO was submitted on October 22. It was prepared, as plaintiff concedes, after UIIS received the October 17 letter notifying the offerors that the October 9 letter was merely informational and soliciting only price revisions. Notwithstanding the instructions in the October 17 letter, plaintiff included revisions to its technical proposal and included no price revisions.

In its fourth BAFO, plaintiff proposed the lowest price ($29,929,609.10). Its technical score (53) was then tied for fifth. This gave UIIS the second best total score (93.00). MVM's fourth BAFO ($31,821,242.17) was the second lowest price, and its technical score (55) was then fourth. MVM's total score of 92.62 was the third best total score. AKAL's proposal received both the highest technical score and the highest total score.

On November 13, 1997, the CO revised the price negotiation memorandum, and decided to award the contract to MVM, thus paying MVM a premium of $1,891,633.01 over the lowest-priced offeror, UIIS, due to the technical advantages of MVM's proposal.[5] The CO stated that MVM's proposed extensive employee background investigations warranted an increase, from 16 to 20 merits, out of 20 possible merits, in MVM's technical score for one subcategory in the Corporate Management section,[6] and a corresponding increase of one point overall, based upon MVM's superior in-house training program for correcting personnel problems and its TQM (total quality management) "tiger team

4. References to FAR sections are to the regulations codified at 48 C.F.R. *et seq.* (1996 edition).

5. UIIS' price was $29.93 million; DynBorg's $34.50 million and MVM's $31.82 million.

6. In the relevant subcategory ("(ii) Offeror's proposed method of implementing a comprehensive security program meeting the requirements of the Government"), the total possible technical score was four evaluation points, which were made up of 90 merits.

approach" for its implementation plan. This increased MVM's total technical score for Corporate Management from 34 to 35 points, its overall technical score from 55 to 56, and its total score from 92.62 to 93.62, the highest among the seven offerors.

The Review Board withheld concurrence in the recommended award because "the basis for that determination [was] not clearly supported." By letter of November 12, 1997, the Board required the CO to "document the file" to explain the "cost/technical tradeoff," to quantify the premium, *e.g.*, by valuing the cost of redoing background investigations, and to reconcile conflicting file information regarding the value of the technical proposals.

On November 13, the CO "rescinded" his prior evaluations and raised MVM's technical score by one point, giving MVM the highest "total point score." This point increase was based on the technical advantages of MVM's background investigation procedures, its in-house training program for correcting personnel problems, and its TQM "tiger team approach."

Defendant awarded the contract to MVM on November 24, 1997. Performance began on December 1, 1997. The other bidders, including plaintiff, were notified of the award (and the price of MVM's proposal) on November 23, 1997. On November 26, 1997, because of the awardee, MVM's, higher price, plaintiff made a written request for a debriefing. None was provided until February, 1998.[7] At the debriefing, defendant stated that, after the initial scoring, it never reviewed or re-scored the changes plaintiff or others made to their technical proposal in the fourth BAFO round, or, for that matter, as defendant conceded at oral argument, any of the offerors' technical proposals, but evaluated only the BAFO price revisions. Defendant justified the award to MVM, which was not the lowest bidder, on the grounds that its proposal offered technical advantages justifying the price premium.

Defendant continues to maintain that MVM's technical advantages warrant a premium. Plaintiff contends that, because MVM's technical proposal was substantially equal to plaintiff's, plaintiff, as the lowest-priced bidder, is entitled to the contract award.

### *Applicable Law*

### *Summary Judgment*

Summary judgment is appropriate when the court finds both that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Motions for judgment on the administrative record, pursuant to RCFC 56.1, are evaluated under the same standards as motions for summary judgment under RCFC 56(a). *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 230 (1997).

Summary judgment is not a disfavored means of resolving disputes, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); on the contrary, it is an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Federal Rules of Civil Procedure (Fed.R.Civ.P.) 1). *See also Avia Group Int'l, Inc. v. L.A. Gear Califor-*

---

7. FAR § 15.1004(a) states that an offeror who makes a written request for a debriefing within three days after receiving notice of a contract award "shall be debriefed and furnished the basis for the selection decision and contract award." The FAR also states that "[t]o the maximum extent practicable, the debriefing should occur within five days after receipt of the written request." FAR § 15.1004(a). Defendant has offered no explanation of the reasons for the delay in debriefing. The FAR does not indicate what consequences, if any, arise from a delay past the five-day period. However, as the United States

Court of Appeals for the Federal Circuit held in *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996), only significant (prejudicial) errors justify setting aside a contract award. Plaintiff has not indicated how it has been prejudiced by this delay, perhaps in recognition, in part, of the fact that the bid protest cost damages recoverable in such a protest were unaffected by the delay. *See LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed.Cir.1995) (plaintiff not entitled to relief when FAR violations did not harm plaintiff "in any concrete way contemplated by the FAR").

*nia, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1562 (Fed.Cir.1987); *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1571 (Fed.Cir.1984); *Frangella Mushroom Farms, Inc. v. United States,* 229 Ct.Cl. 578, 583 (1981).

Because there are no disputed issues of material fact, this case hinges upon whether either party is entitled to judgment as a matter of law. RCFC 56. The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)).

### Post–Award Bid Protests

■ In post-award bid protests brought pursuant to 28 U.S.C. § 1491(b)(1) (1997),[8] the court must apply the standard of review for agency action established by the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994). An agency's procurement decision will be overturned or set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); 28 U.S.C. § 1491(b)(4).

■ Courts afford agencies conducting negotiated procurements broad discretion in determining which bid is most advantageous to the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993) (quoting *Tidewater Management Servs., Inc. v. United States,* 216 Ct.Cl. 69, 573 F.2d 65, 73 (Ct.Cl.1978)); *NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (Ct.Cl.1980); *Sperry Flight Sys. Div. v. United States,* 212 Ct.Cl. 329, 548 F.2d 915,

921 (Ct.Cl.1977); FAR § 15.605(b). If an agency's decision is grounded in reason, the court will not disturb its award decision. *See, e.g., Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996).

■ Nevertheless, the Competition in Contracting Act (CICA) of 1984, as amended, codified at 41 U.S.C. § 251 *et seq.* (1994), requires an agency to "evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation." 41 U.S.C. § 253b. The FAR, too, requires proposals to be evaluated "solely on the factors specified in the solicitation." FAR § 15.608(a). When the solicitation sets out an evaluation process, failure to follow the process may amount to a violation of law. *See Keco Indus. Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (Ct.Cl.1974).

Not every error, however, requires rejection of the agency's award. *See SMS Data Prods. Group, Inc. v. United States,* 900 F.2d 1553, 1557 (Fed.Cir.1990); *Excavation Constr., Inc. v. United States,* 204 Ct.Cl. 299, 494 F.2d 1289, 1293 (Ct.Cl.1974). The court will not overturn a contract award based on *de minimis* errors made in the procurement process. *See LaBarge,* 46 F.3d at 1556; *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[O]verturning awards on *de minimis* errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations.") (quoting *Andersen Consulting v. U.S. Computer Sciences Corp.,* 959 F.2d 929, 932 (Fed.Cir. 1992)).

■ To prevail in a bid protest, the protester must show, not only significant error in the procurement process, but also that the error prejudiced the protester. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data General,* 78 F.3d

8. 28 U.S.C. § 1491(b)(1) provides:
Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

at 1562; *LaBarge*, 46 F.3d at 1556; *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995) (not all violations of statute and regulation are the same; only a "clear and prejudicial" violation of a procurement statute or regulation warrants relief); *CACI Field Servs. v. U.S.*, 854 F.2d 464, 466 (Fed.Cir.1988) (same). To establish prejudice, a protester must show that, but for the alleged error, there was a reasonable likelihood that the protester would have received the award. *Data General*, 78 F.3d at 1562.

The Court of Claims in *Keco Indus.* established four factors that would warrant a court's setting aside an agency action or decision: (1) subjective bad faith on the part of the procuring officials, thus depriving plaintiff of fair and honest consideration of its proposal; (2) no reasonable basis for the procuring officials' decision; (3) abuse of discretion by the procuring officials; or (4) procuring officials' violation of pertinent statutes or regulations. *See Keco Indus.*, 492 F.2d at 1203–04. A violation of procurement laws or regulations or solicitation provisions is subject to the "harmless error" standard, under which such a violation does not merit relief if the violation was not prejudicial. *E.g., Lincoln Servs., Ltd. v. United States*, 230 Ct.Cl. 416, 678 F.2d 157, 158 (Ct.Cl.1982) (per curiam) (citing *Keco Indus.*, 492 F.2d at 1203); *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997).

In protest actions, the scope of review is generally limited to the administrative record, *i.e.*, the record before the agency when it made its final decision. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("In applying [the standard stated in 5 U.S.C. § 706], the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). *See generally Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339 (1997).

### Discussion

Plaintiff argues that "the agency's last minute re-scoring of MVM's proposal—undertaken to rationalize a contract award decision that could not be justified under the award method that the agency had used—is a classic example of conduct that warrants setting aside the award decision." Plaintiff identifies four alleged "fundamental errors" in the solicitation. First, plaintiff claims that it was improper for only one TEB member, rather than the TEB as a whole (as required by the RFP, the Instructions for Technical Evaluation, and the CICA), to re-score (albeit with the TEB's consent) the technical proposals. Second, plaintiff faults defendant's failure to evaluate the technical proposal revisions in plaintiff's fourth BAFO. Third, plaintiff alleges that the agency's failure to award the contract to the lowest-priced proposal, UIIS, violated the FAR and solicitation section M–9 applicable to "substantially technically equal proposals." See AR 2658 ("Between substantially equal technical proposals, the proposed price will be the determining factor in selection of a proposal for award."). Finally, plaintiff contends that the CO's addition of one point to MVM's technical score was done solely to award the contract to MVM, was arbitrary when plaintiff otherwise had a lower price and a higher overall score than MVM, and was not warranted by the amount of the underlying merit increase for that technical category.

In a bid protest case, the court must determine (1) whether defendant's officials' subjective bad faith deprived plaintiff of the fair and honest consideration of its proposal; (2) whether defendant had a reasonable basis for its administrative decision; (3) whether procurement officials abused the discretion entrusted to them by applicable statutes and regulations; and (4) whether defendant violated a pertinent statute (CICA) or regulation (FAR), and, if so, whether the violation is not harmless error and constitutes a ground for recovery.

### I. Re-scoring of Technical Proposals

Plaintiff claims that it was improper and violated FAR § 15.608(a) for a single TEB member (Charles Moore) to abandon the TEB's scores and re-score the technical proposals. FAR § 15.608(a) states that proposals shall be evaluated based "solely on the factors specified in the solicitation." Plaintiff

also contends that Mr. Moore improperly ignored instructions in the RFP and the agency's instructions for the technical evaluation of proposals in negotiated procurements in violation of 41 U.S.C. § 253b(a) ("An ... agency shall evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation.").

It is undisputed that TEB member Charles Moore re-scored the offerors' technical proposals after the TEB's initial scoring. It also is undisputed that the RFP called for the TEB members to score the technical proposals individually, to discuss the proposals collectively, and to arrive at a consensus for a summary report to the CO.

It is not clear from the administrative record, however, whether, or, if so, how the TEB followed the evaluation instructions, e.g., that each TEB member individually perform tasks 1, 2 and 3 as described in section D ("Step 1—Preliminary Evaluation Report"),[9] and the instruction that the TEB members collectively engage in a group discussion "to arrive at a consensus [of] ... the strengths, deficiencies, and weaknesses of [each] proposal," AR 2302, 2303. Nor is it clear whether, as the instructions required, the TEB members completed separate forms to record any changes in proposal evaluations resulting from a group discussion, see AR 2304; or whether the TEB prepared a preliminary evaluation report (only the Final

Technical Report was included in the administrative record).

Nevertheless, there is evidence of substantial compliance with the RFP's TEB procedures. The TEB chairperson, Raymond Gagnon, in sending the final technical report to the CO (after re-scoring) stated: "[i]t is the consensus of the Board that the proposals were either acceptable as submitted, conditionally acceptable, or unacceptable," and included the TEB's scoring of the offerors' technical proposals. Also, no evidence has been proffered, and none appears in the administrative record, to indicate that the TEB did not actually meet and discuss Mr. Moore's scores and arrive at a consensus before its recommendations were sent to the CO. The burden of proof, of course, is on plaintiff. See Hoel–Steffen Constr. Co. v. United States, 231 Ct.Cl. 128, 684 F.2d 843, 848 (Ct.Cl.1982); Tidewater Management Servs., 573 F.2d at 67; Keco Indus., 428 F.2d at 1233.

Moreover, even if Mr. Moore, rather than the TEB alone, re-scored the proposals without complying with each TEB procedural rule, such failures are not significant, as the TEB's role is clearly described in the solicitation as advisory only. See AR 2657. Also, the solicitation stated that the CO could reject the TEB's advice. Thus, the CO alone had the ultimate authority and responsibility for evaluating each proposal. The lack of any documentation that defendant complied with each specific instruction of the RFP

9. Section D states (in pertinent part):
D. Step 1—Preliminary Evaluation Report
1. Task 1: The first task consists of an initial review by each TEB member to classify the proposals as acceptable, conditionally acceptable, or unacceptable.

2. Task 2: The initial classification of proposals is followed by a second review to comparatively assess each offer's potential to satisfy the specification or statement of work.

3. Task 1 and Task 2 are conducted independently by each TEB member, using the evaluation forms provided.... Each evaluator shall complete, date, sign, and deliver to the TEB Chairperson one form for each proposal reviewed.

6. Task 3: Finally, the results of the independent technical evaluations are merged into a summary report subsequent to a group dis-

cussion attended by all TEB members.... The purpose of the group discussion is to arrive at a consensus concerning the strengths, deficiencies, and weaknesses of a proposal, the score to be applied, and changes in individual opinions concerning a proposal's response to a given solicitation factor based upon a group review of each committee member's perspective.

8. When a TEB member adjusts his/her individual evaluation, a separate evaluation form is completed indicating a revision.

9. The [preliminary evaluation] report must also be accompanied by the evaluation sheets prepared by each individual member of the TEB.
(Emphasis in original).

does not establish that defendant violated the RFP or the FAR, because the court must presume the regularity of government action absent any evidence (and none appears here) of actual irregularity.[10] *See CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 729–30 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir. 1988) (citing *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 813 (Ct.Cl.1979)); *Kalvar Corp., Inc. v. United States*, 211 Ct. Cl. 192, 543 F.2d 1298, 1301–02 (Ct.Cl.1976); *Wathen v. United States*, 208 Ct.Cl. 342, 527 F.2d 1191, 1198 (Ct.Cl.1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

Plaintiff's factual allegations of misconduct are not supported by the record. Plaintiff bears the burden of proving such allegations in order to rebut the presumption of regularity given the actions of government officials. *See Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed.Cir.1995); *Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 771 (Ct.Cl.1982) (a plaintiff must present "well-nigh irrefragable proof" that the government acted in bad faith). Therefore, plaintiff bears the burden of proving the government's bad faith. *See A–Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1585 (Fed.Cir.1994).

Plaintiff's allegation that defendant re-scored the technical proposals in a purposeful effort to deny the award to one offeror—plaintiff, and to direct the award to another—MVM, is unsubstantiated. The fact that plaintiff's technical score, which was the best in the TEB's initial evaluation, was downgraded after Mr. Moore's re-scoring, does not, without more, establish animus toward plaintiff—that is, that defendant was prejudiced against plaintiff specifically. This may be implied from the fact that Mr. Moore's re-

scoring affected 5 other offerors of the 7 "acceptable as submitted" offerors. Thus, 6 of the 7 rankings were changed by the re-scoring. Further, DynBorg's score dropped almost as much as plaintiff's (only .75 points less). Finally, the highest technical ranking after the re-scoring did not go either to plaintiff or to the successful bidder, MVM, but rather to AKAL (which ultimately did not receive the award because its price was too high). In fact, four other offerors had revised technical scores higher than UIIS', and three had technical scores higher than MVM's.

| Offeror | Initial Score | Revised Score |
|---|---|---|
| AKAL | 55.75 | 58 |
| Pinkerton | 57.50 | 57 |
| General Security | 56.00 | 56 |
| MVM | 54.50 | 55 |
| DynBorg | 58.00 | 53 |
| UIIS | 58.75 | 53 |
| First Security | 49.75 | 47 |

## II. Technical Revisions Submitted in Fourth BAFO

▮ FAR § 15.601 defines "discussion" as "any oral or written communication between the Government and an offeror ... that (a) involves information essential for determining the acceptability of a proposal, or (b) provides the offeror an opportunity to revise or modify its proposal." FAR § 15.610(c) provides that "[t]he contracting officer shall ... (5)[p]rovide the offeror an opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions...."

Plaintiff argues that defendant's failure to evaluate plaintiff's technical revisions in its fourth BAFO violated FAR § 15.610(c)(5), prejudiced plaintiff, and breached its implied duty of good faith and fair dealing. However, the solicitation here stated that defendant

---

**10.** In another case filed in this court involving protest of the award of a security services contract (to a bidder for services for federal courthouses in the second judicial circuit), the court awarded plaintiff injunctive relief preventing defendant from exercising its option to extend the subject contract beyond the initial term. *See United Int'l Investigative Servs.*, 41 Fed.Cl. at 324 (*UIIS I*). That case is distinguishable because there was evidence to support plaintiff's claim that TEB members did not adhere to the RFP's evaluation procedures. Unlike the procurement in *UIIS I*, the TEB report here represented that all TEB members consented to the scores. Also,

there is no evidence here, unlike in *UIIS I*, that TEB members did not hold discussions. In addition, following award of the contract to MVM in *UIIS I*, defendant incorrectly informed plaintiff that it was not selected for the award "because [its] evaluated price [was] $227,671.56 above the awardee," *id.* 41 Fed.Cl.at 316–17, when, in fact, plaintiff's price was *lower* than the awardee's price. *Id.* Only *after* the contract award did the agency attempt to justify the award based on MVM's supposed technical advantages. *Id.* Here, the agency stated that the technical advantages warranted a price premium at the time of award.

"reserve[d] the right to award on the basis of the initial proposal *without any discussions.*" AR 2654 (emphasis added.). And the FAR requires discussion and review only if the government has asked a bidder "to revise or modify its proposal." *See* FAR § 15.601(b). The government here did not ask for a revision to the technical proposal.

Moreover, plaintiff's technical revisions, though purporting to respond to the agency's October 9, 1997 memorandum (and specifically addressing concerns raised in that memo), were unsolicited because the agency's October 17, 1997 memo to all offerors (which plaintiff received *before* preparing its response to the fourth BAFO) stated that the October 9 memo was intended to be merely informational. Finally, defendant formally closed discussions by a letter dated October 20. Plaintiff also concedes that it received this notice prior to submitting its fourth BAFO response containing the technical revisions. Transcript of Evidentiary Hearing and Oral Argument held May 26, 1998 (Tr.) at 145.

Plaintiff's contention at oral argument that defendant's October 9 letter, by inviting the offerors to "review [their] price and/or technical proposal[s] for areas that are not in the best interest of [the] program," opened technical discussions regarding the issues discussed in the letter (staffing and strike contingency plan), see Tr. at 8–9, must be rejected, as unsupported by the record. There is no evidence in the record that defendant ever explicitly opened technical discussions, as opposed to price discussions, in the BAFO state of the procurement.

Plaintiff's argument that the agency considered other offerors' technical revisions in earlier BAFO submissions is also unsupported by the record. DynBorg's October 23 letter, which plaintiff identifies as a technical revision considered by the agency, merely stated that DynBorg considered its October 3 submission to be its best and final offer. DynBorg's October 3 BAFO consisted only of a revised Business Proposal. Likewise, DynBorg's August 19 and September 23 BAFOs consisted only of revisions to its Business Proposal, not to its Technical Proposal.

MVM's October 23 BAFO submission did state that "[i]n order to minimize the possible discord and upheaval that may occur by drastically reducing the wages to the wage determination level, MVM has chosen to maintain the present wage level for those CSOs in Puerto Rico." AR 677. However, MVM went on to expressly represent that it was making *no* changes in its October 23 BAFO letter. Furthermore, MVM's October 3 and August 19 BAFO submissions clearly were limited to changes to its Business Proposal.

That defendant's October 9 letter was not intended to, nor did, discriminate against plaintiff is clear from the fact that defendant addressed (and presumably sent) the same letter to every offeror within the competitive range in four other, separate procurements. See AR 2876 (letter addressed to "All Offerors within the Competitive Range; Court Security Officer Solicitations; 1st, 2nd, 5th, 7th Judicial Circuits"). The purpose of this distribution was to inform the addressees, not to open technical discussions with them. Again, any possible ambiguity in the October 9 letter was explicitly corrected by defendant's subsequent October 17 letter "[i]n response to several requests to clarify [the] October 9, 1997 letter." AR 2377. Consequently, the court finds plaintiff's assumption that the letter requested technical revisions to be unreasonable.

Evaluating only *plaintiff's* subsequent technical revisions, submitted after plaintiff received the October 17 letter disavowing any request for revision of technical proposals, would have been inequitable to all *other* offerors (and could have resulted in another offeror's challenge to the contract award). See Tr. at 144. Therefore, defendant was justified in not evaluating the technical revisions in plaintiff's fourth BAFO.

Plaintiff also argues that it is improper for defendant to draw inferences regarding the submission of technical revisions in the various BAFOs based on only three other offerors' proposals subsequently included with the administrative record, implying that defendant possibly concealed technical revisions made by other offerors. As previously noted, this type of allegation is not probative;

plaintiff, which bears the burden of proof, must show "well-nigh irrefragable proof" that the government acted in bad faith. *See Caldwell & Santmyer,* 55 F.3d at 1581. The court is bound by the strong presumption that government officials act correctly, honestly and in good faith when considering bids. *See CACI Field Servs.,* 13 Cl.Ct. at 729–30, *aff'd,* 854 F.2d 464 (Fed.Cir.1988). Again, plaintiff does not rebut that presumption.

III. *Substantial Technical Equality*

 RFP section M–9 (Award Selection) states that "[b]etween substantially equal technical proposals, the proposed price will be the determining factor in selection of a proposal for award." AR 2812. Plaintiff argues that procurement officials determined that MVM's, DynBorg's, and plaintiff's proposals were "substantially technically equal," and thus that defendant should have awarded the contract to plaintiff based on its lower cost. "Substantially technically equal," however, is a term of art, Tr. at 134, and plaintiff points to no evidence in the record that the agency ever found the proposals to be "substantially technically equal" at any point in the procurement process.

Plaintiff also argues that the agency made an "implicit" determination of substantial technical equality among the offerors in the initial competitive range when the TEB found no deficiencies or weaknesses in their proposals. See AR 2839 (initial competitive range determination). However, the TEB expressly found these seven offerors to be merely "technically acceptable," or within the initial competitive range, not "substantially technically equal." AR 2314, 2328, 2420. Express language trumps implications.

While the Review Board noted, in its third policy/procedures review, that defendant's September 23, 1997 addendum to the price negotiation memorandum (PNM) stated that MVM's, DynBorg's, and plaintiff's proposals were "substantially technically equal," see AR 2323–24 (PNM addendum dated September 23, 1997), this does not establish that defendant abused its discretion or breached any duty to plaintiff, as the Review Board process was an internal agency review seeking to correct any conflicts in the file, AR 2425. Further, the correction, which was made in the November 13,1998 PNM addendum rescinding the August 23, 1997 and September 23, 1997 PNMs,[11] was never communicated to the offerors. Also, the CO enjoyed the discretion under solicitation section M–9 [12] to determine whether "specific technical advantages [were] worth the amount of any premium in price." AR 2812. See also section M–6, stating that the CO retains "the ultimate authority to determine the technical evaluation of each proposal." AR 2810.

Furthermore, as is evident from the third policy/procedures review, the Review Board did not *dispute* the CO's award to MVM (or his evaluation of the proposals' technical advantages), but merely required the CO to *justify* the award, by explaining more fully MVM's technical advantages. Based on the CO's justification in the November 13, 1997 PNM, the Review Board, on November 19, 1997, concurred with the award, concluding that the listed technical advantages were sufficient to justify the contract award.

Procurement officials have a great deal of discretion, particularly in negotiated procurements. *See Lockheed,* 4 F.3d at 959. As the Federal Circuit noted in *LaBarge,* 46 F.3d at 1555, the government's discretion is grounded in its "strong interest in ensuring that the procurement meets its needs." The government's need for security services in federal courthouses, both for courthouse personnel and the public at large, is evident. In the CO's opinion, performing employee background checks on potential courthouse security officers was but one aspect of those services in which MVM's proposal offered a technical advantage over the other offerors. Additionally, he found that MVM's TQM implementation plan and its in-house training

---

11. See AR 2319 ("After further review, the basis for award and the value of the technical scores as originally stated in the PNM . . . are rescinded.")

12. Solicitation section M–9 states that the CO "has the right to determine whether any differences in technical weighing are 'significant' for purposes of evaluating the overall merit of proposals." AR 2812.

plan for correcting personnel problems warranted the increase in its score. AR 2318. The court will not now second-guess the CO's technical evaluation of the submitted proposals' advantages and disadvantages.

From the facts in the administrative record, it is apparent that the CO's decision not to award the contract, based on "substantially technically equal" proposals, to the lowest bidder, was reasonable.

### IV. *Addition of One Point to MVM's Score*

▮▮▮ Plaintiff alleges that defendant's addition of one point to MVM's score was arbitrary, and done solely to justify its award to MVM. Defendant contends that the point reflected the technical advantages offered in MVM's proposal for areas in which MVM exceeded the agency's requirements, such as (1) employee background checks; (2) correcting personnel problems; and (3) implementation plan.

It is undisputed that, on November 13, 1997, defendant added one point to MVM's overall technical score, resulting in an increase from 55 to 56. The reasoning behind the score increase, however, is strongly disputed.

The agency's reasons for increasing the technical score appear in the price negotiation memorandum issued November 13, 1998, which states that MVM's overall score increase resulted from increasing the merits for the employee background investigation technical evaluation factor, from 16 to 20 merits, were due to the technical advantages of MVM's proposal to conduct much more extensive employee background checks than the agency required. This increased the *total* number of merits MVM received for part (ii) ("Offeror's proposed method of implementing a comprehensive security program meeting the requirements of the Government") of the Corporate Management portion of the technical evaluation, from 68 to 72 merits. This merit range corresponds to a point score of 3.

The CO's increase in the merit score from 68 to 72, due to the technical advantages offered by its employee background checks, allegedly justified MVM's point score increase from 3 to 4 for this category. Under the Instructions for Technical Evaluation Factors, AR 2270 ("Overall Rating for Categories (ii)(A)–(ii)(F)"), a merit score totaling between 51 and 80 merits resulted in a point score of 3; a merit score between 81 and 90 resulted in a point score of 4.

Plaintiff argues that, because MVM's 72–merit score was 9 merits shy of 81, the lowest merit score that could earn 4 points for the section, MVM should not have received the one point increase which justified the contract award to MVM. However, the court concludes that the 9 merit difference is *de minimis*, amounting to only 10 percent of the total merits for that section (ii), and only 3 percent of the total merits for the Corporate Management section. Further, the one point difference from 3 to 4 represents only 2.5 percent of the total points for the Corporate Management section and only 1.6 percent of the total 60 points for the overall technical score.

At oral argument, defendant conceded that the increase from 16 to 20 merits for categories (ii)(A) through (ii)(F) (of the Corporate Management Section) should not alone have resulted in a one-point increase in the total technical score for Corporate Management. MVM's proposed more extensive employee background checks were not, however, the only technical advantage warranting a price premium for MVM. See Tr. at 136. Other technical advantages of MVM's proposal included its implementation plan and its in-house training program for correcting personnel problems. While MVM's proposed background investigations easily produced quantifiable advantages for the agency,[13] its other not as readily quantifiable technical advantages were sufficient, in defendant's view, to account for the remainder of the one-point increase in MVM's Corporate Management, and, consequently, in its higher overall technical score.

---

**13.** The CO stated in his November 13, 1997 addendum to the PNM that MVM's proposal offered technical advantages that "could eliminate the USMS incurring lost time for repetitive background investigations." AR 2319. The agency incurs an approximate cost of $1,800 for each background investigation. AR 2424.

Not every error by a CO justifies overturning an award. *See SMS Data Prods.*, 900 F.2d at 1557; *Excavation Constr.*, 494 F.2d at 1293; 40 U.S.C. § 759(f)(5)(B) (1994). The court concludes that, if the agency erred in awarding MVM the additional point, the error was *de minimis*, and does not require overturning this award. *See Grumman Data Sys.*, 88 F.3d at 1000 (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932–33, 935 (Fed.Cir.1992) ("*De minimis* errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are.")).

The court concludes, as did the Review Board in its fourth policy/procedures review on November 18, that the CO's decision to add a point to MVM's technical score was reasonable. The agency sufficiently justified the additional point by noting the technical advantages offered in MVM's technical proposal. MVM's superior employee background checks earned it 4 additional merits in the appropriate Corporate Management subsection. The intangible technical advantages MVM offered, such as its in-house training program for correcting personnel problems and its TQM tiger team approach for the implementation plan, made up the remainder of the 9 additional merits resulting in the one point addition to its score.

### Conclusion

The court concludes that none of the "fundamental errors" raised by plaintiff violate the four requirements for bid protests established by the court in *Keco*, 492 F.2d at 1203–04. First, any errors in this procurement were *de minimis* and not prejudicial to plaintiff. *See Statistica*, 102 F.3d at 1581. Second, plaintiff did not show with a reasonable likelihood that, absent any of the alleged errors, it would have received the contract award. *See Data General*, 78 F.3d at 1562.

Accordingly, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The Clerk shall enter judgment for defendant.

This order and opinion shall be kept under seal until August 17, 1998, when it will be filed in its redacted form. The parties shall file any proposed redacted copy of this opinion pursuant to the protective order filed April 8, 1998.